[Civ. No. 18649. Second Dist., Div. One. Apr. 16, 1952.]

VIOLA ELMA LAWRIE, Respondent, v. HAROLD JOHN LAWRIE, Appellant.

Block & Dunbar for Appellant.

George Arnold Wilde for Respondent.

DRAPEAU, J.—On June 28, 1949, plaintiff filed her action for divorce against defendant on the ground of extreme cruelty. The complaint alleged that the community property included two parcels of realty. The answer denied the cruelty and also the community character of the realty, alleging that it was held in joint tenancy. Defendant filed a cross-complaint for divorce on the ground of extreme cruelty which was denied by plaintiff's answer.

After a lengthy trial, the court found that both parcels of real estate were community property; that defendant had wrongfully inflicted upon plaintiff great and grievous physical and mental suffering and that the allegations of defendant's answer and cross-complaint were untrue.

The interlocutory judgment awarded plaintiff a divorce from defendant and divided the property between them, awarding the home to plaintiff and the other parcel of realty to defendant.

Defendant appeals.

The parties hereto have been married over thirty years; have two married daughters and a minor son. Both husband and wife work; both are high-strung and nervous. Husband is a veteran of World War I and suffers from pernicious anemia. His mother lives in the home.

Plaintiff testified that she and her husband had quarreled all during their married life; that husband was habitually intemperate although he worked steadily; that he drank after working hours "almost continuously every night . . . he drinks beer in the house and has a bottle of wine in the garage." Also, that on one occasion he knocked her down

and threatened to choke her; called her names and swore at her, embarrassed and humiliated her before other people, causing her to become nervous and ill.

With respect to specific acts of cruelty, plaintiff testified that on June 12, 1949, defendant came into her room at 7:30 a. m. "he got in bed with me and his breath smelled of liquor and I asked him if he had been drinking and he said 'No.' . . . I said 'Your breath smells terrible.' . . . And he started to get up out of bed and he pulled me back and I made it out and then he threw me on the floor and put his knee in my neck and held me there for a few minutes and then he let me go and then I screamed for my son, and when I did that he put his knee in my chest and said, 'God damn you, I'll choke you to death.' . . . by that time I was very nervous, so I got up and left the room. . . . I took a bath and I didn't have my dress on and I had washed some stockings the day before and left them in the wash room and I went out there to get the stockings to put on to go to work. He was in the kitchen starting to prepare breakfast . . . when I started to come back into the room he would get on one side to keep me from getting in and I (went) back to the garage. . . . And I called my son (to) . . . come stay in the room until I got dressed and went to work. . . . Then when I turned around . . . my husband was coming out of the door and he had my son's kodak . . . he said 'Damn you, I am going to take your picture to show to your friends and your children how you went outside and the way it looked . . .' And there was a hose right there and I picked up this hose with the intention of knocking the kodak out of his hand, and I knocked the kodak out of his hand and also hit him on the hand when I did it."

On June 15, 1949, when plaintiff returned home from work at 9 in the evening, she found her husband in an intoxicated condition with red face and glassy eyes, which "frightened me so terribly" that she went to a friend's house where she stayed all night.

On Sunday, June 5th, plaintiff stayed all night with her daughter and went directly to her work on Monday morning without stopping at her home; that when she arrived her employer asked "Mrs. Lawrie, how is your son?" She replied, "What do you mean? . . . and he says 'Your husband was down to the store and says your son was very ill and might have to have an operation.' " That her employer took her home and she went into the house and found that her "son

was lying on the davenport.'' Before she spoke to him ''He started to laugh and said 'Mother, why don't you go on back to work? There isn't anything the matter with me.' By that time the Mister had heard me talking to Junior and he came out then and he was so mad he didn't know what to do and he says, 'What in the hell are you doing here? You go back to work where you belong.' ''

On one occasion when she attended a theatre with her husband's knowledge, she found the doors to the house locked when she returned home. On another, when a salesman was demonstrating a vacuum cleaner for plaintiff, her husband came into the room and said, ''What in hell is going on here. . . . I want you to know that I will not pay any bills that my wife incurs.''

During this period, plaintiff was expecting her sister to visit her and she asked defendant to have the house redecorated because it was greatly in need of it. He refused saying, ''We like it just like this and we can just continue on living in it like this, and I would like to have you sister come out here and see what a dirty housekeeper you are.'' Plaintiff and one of her daughters did some painting themselves which defendant said ''was a lousy job and I should be ashamed to have anyone see it.'' Defendant also stated to plaintiff ''I am telling you one thing, your sister comes out here, and I'm going to show her just how mean I can get, and I am going to drink and do everything else.'' The sister did visit plaintiff and during that time defendant did drink a lot.

One of their sons-in-law contracted polio, and defendant said to plaintiff, ''Well, it was probably you that carried polio to Bill.'' Plaintiff testified she took this remark seriously, thought her husband meant it and still thinks so.

The two daughters took the stand and corroborated plaintiff's testimony with respect to defendant's drinking, name-calling, and his attitude in general toward their mother which resulted in the latter becoming very nervous and upset. One daughter testified that in May of 1949, her father asked her to try to persuade plaintiff to sign a note because ''all he wanted was $10,000.00 and his mother and he didn't care about his family.''

Defendant either denied or explained away each incident brought out by testimony on behalf of plaintiff.

It is here urged that the judgment was not justified because respondent's evidence showed that she was equally responsible for the family discord, and that the alleged acts of cruelty on

the part of appellant did not cause her grievous mental suffering.

In *Keener* v. *Keener*, 18 Cal.2d 445, 447 [116 P.2d 1], our Supreme Court held: "Section 94 of the Civil Code defines extreme cruelty as 'the wrongful infliction of grievous bodily injury, or grievous mental suffering, upon the other by one party to the marriage.' In each case the infliction of grievous mental suffering' is a question of fact to be deduced from the circumstances of the case, in the light of the intelligence, refinement and delicacy of sentiment of the complaining party. (*Barnes* v. *Barnes,* 95 Cal. 171 [30 P. 298, 16 L.R.A. 660]; *Fleming* v. *Fleming,* 95 Cal. 430 [30 P. 566, 29 Am.St.Rep. 124]; *MacDonald* v. *MacDonald,* 155 Cal. 665 [102 P. 927, 25 L.R.A.N.S. 45]; *Avery* v. *Avery,* 148 Cal. 239 [82 P. 967]; *Cline* v. *Cline,* 4 Cal.App.2d 626 [41 P.2d 588]; *Shaw* v. *Shaw,* 122 Cal.App. 172 [9 P.2d 876]; *Davis* v. *Davis,* 58 Cal.App. 100, 102 [207 P. 923]; *Van Camp* v. *Van Camp,* 53 Cal.App. 17, 22 [199 P. 885].) A correct decision must depend upon the sound sense and judgment of the trial court. (*Barnes* v. *Barnes, supra*; *Shaw* v. *Shaw, supra.*) Its conclusion will not be disturbed unless the evidence is so slight as to indicate an abuse of discretion. (*MacDonald* v. *MacDonald, supra*; *Davis* v. *Davis, supra*; *Andrews* v. *Andrews,* 120 Cal. 184 [52 P. 298].)

"A course of conduct by which one party to the marriage continually indicates dissatisfaction with the other and makes such dissatisfaction known to friends of the parties may well cause humiliation, embarrassment and mental anguish to a degree constituting extreme cruelty."

In *Tompkins* v. *Tompkins,* 83 Cal.App.2d 71, 74 [187 P.2d 840], it was said: "Conduct that would induce grievous mental suffering sufficient to constitute extreme cruelty depends upon the circumstances of each particular case, and the finding of a trial court, based upon any reasonable analysis of the facts and circumstances as reflected by the evidence, will not be disturbed on appeal. (*La Mar* v. *La Mar,* 30 Cal.2d 898 [186 P.2d 678]; *Barnes* v. *Barnes,* 95 Cal. 171 [30 P. 298, 16 L.R.A. 660]; *Fleming* v. *Fleming,* 95 Cal. 430 [30 P. 566, 29 Am.St.Rep. 124]; *Andrews* v. *Andrews,* 120 Cal. 184 [52 P. 298]; *Keener* v. *Keener,* 18 Cal.2d 445 [116 P.2d 1]; see, also, *Hansen* v. *Hansen,* 86 Cal.App. 744 [261 P. 503]; and *McFall* v. *McFall,* 58 Cal.App.2d 208 [136 P.2d 580].)"

"Proof of extreme cruelty may be made by testimony of cruel remarks made by one spouse to the other. (*Maloof*

v. *Maloof*, 175 Cal. 571 [166 P. 330].)'' *Stevens* v. *Stevens*, 92 Cal.App.2d 85, 87 [206 P.2d 418].

It is evident from the authorities cited that the trial judge is vested with great latitude in determining the weight and sufficiency of all evidence presented to him in an action such as this. The parties and the witnesses were before him and he was in the best position to judge their credibility and to determine their motives. ■■ The instant action was hotly contested and much of the evidence is in direct conflict. However, there is sufficient evidence, if believed, to support the judgment of divorce in favor of respondent. As a result, this court is powerless to intervene.

■■ . Appellant also complains that there was no evidence to support the finding that the two parcels of real property standing in the names of the parties as joint tenants, were in truth community property.

The trial court found that the realty was held in joint tenancy for convenience only, and in fact was community property.

Respondent testified that when the home place was acquired in 1931, she and her husband went to the bank to sign the papers, appellant told her it was not necessary for her to read them, because ''It is community property, it is all right. You don't have to read it today.'' Subsequent thereto, that appellant on several occasions stated that ''he wasn't going to have any more community property.'' With respect to this particular transaction, appellant stated that the bank clerk told him and his wife that if she were buying the property she would take it as joint tenants; that if appellant died ''it went to my wife and if she passed away it automatically went to me''; and that he understood right of survivorship to mean ''automatically go to the other party without them having to go to court to have the matter adjusted, which would be added expense for poor people.''

When the second piece of property was acquired in 1933, respondent testified that appellant's father accompanied them to the bank and told her in the presence of appellant, ''Viola, you can take my word for it, it's O. K., it's community property and you go ahead and sign it and it will save time.'' Appellant made no comment at the time.

When asked what she understood community property to mean, respondent said: ''My idea of community property was that everything should be divided equally and if we had

two places it should be divided equally," and if her husband died, she would get it. To the question "Did you have any understanding as to whether or not you could dispose of your half without his consent or his joining, respondent replied: "I never even thought to ask that question. That never entered my head that we could do a thing like that."

It is conceded that both parcels were acquired during the marriage relation and were paid for out of the husband's earnings.

We believe this evidence is sufficient to sustain the trial court's finding that the properties were acquired in joint tenancy for convenience, but in truth were community property of the parties.

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.